UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

UNITED STATES OF AMERICA,

              v.

LARRY PAGETT,

              Defendant.

-----------------------------------------------------------------X

RD 11|8|19

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★    NOV 08 2019    ★

BROOKLYN OFFICE

**DECISION & ORDER**
17-CR-306 (WFK)

**WILLIAM F. KUNTZ, II, United States District Judge:**

On June 7, 2017, a grand jury returned a one-count Indictment charging Larry Pagett ("Defendant") with murder-in-aid-of-racketeering for the murder of Chrispine Philip. *See* Indictment, ECF No. 1. On October 24, 2018, a unanimous jury found Defendant guilty on the sole count of the Indictment. *See* Trial Tr. ("Tr.") at 1020-22. Defendant now moves for acquittal, or alternatively, a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, respectively. *See* ECF No. 95 ("Def. Mot."). For the reasons discussed below, Defendant's motion is DENIED in its entirety.

## BACKGROUND

On June 7, 2017, the Government filed a one-count Indictment charging Defendant with murder-in-aid-of-racketeering, in violation of 18 U.S.C. § 1959(a)(1). *See* Indictment. Specifically, the Indictment alleged on or about August 28, 2015, Defendant, a member and leader of the Eight Trey Crips street gang, and others knowingly and intentionally murdered Chrispine Philip for the purpose of maintaining and increasing his position in the Eight Trey Crips. *Id.* On June 23, 2017, Defendant pled not guilty as to the sole count. ECF No. 7.

The jury trial in this action commenced on October 16, 2018. *See* Tr. 1-2. At trial, the Government called the following witnesses: Crystal Garner; Detective Andre Bovell of the New York City Police Department ("NYPD"); Neil Jordan, a member of the Eight Trey Crips; Detective Lucasz Siek of the NYPD; medical examiner Sean Kelly, M.D., of the Office of the Chief Medical Examiner for the City of New York; Officer Luis Lopez of the NYPD; David

1

Magnuson of the Sierra Cellular Analysis Group, an expert in cell site data analysis; Detective John Sivori of the NYPD; and forensic examiner Rachel Clay of the Federal Bureau of Investigations ("FBI"), an expert in questioned documents. Defendant called the following witnesses: Trevon Lewis, a party promotor from the East Flatbush sector of Brooklyn, New York; Robert Brennan, a private investigator and expert in the possession and handling of handguns; and Jonathan Victor, a member of the Eight Trey Crips.

On October 24, 2018, a unanimous jury returned a verdict of guilty on the sole count of the Indictment. *See id.* at 1020-22. On March 8, 2019, Defendant filed a motion for a judgment of acquittal or, alternatively, a new trial. *See Def. Mem.* The Government filed its opposition on June 7, 2019, *see* ECF No. 96 ("Gov't Opp."), and on August 15, 2019, Defendant filed his reply, *see* ECF No. 98 ("Def. Reply").

**SUMMARY OF TRIAL EVIDENCE**

## I.    The Eight Trey Crips Street Gang

Witnesses for both the Government and defense testified at trial about the Eight Trey Gangster Crips, or the Eight Trey Crips, street gang ("Eight Trey"). Cooperating witness Neil Jordan (also known as "Little Gotti"), who joined Eight Trey at sixteen years old in 2009, testified extensively to the existence and activities of the gang. Tr. at 76-77. According to Jordan, Eight Trey—a smaller group or "set" of the Crips—is a street gang that originated in California and operates in regions across the country, including the Crown Heights, Flatbush, East York, and Brownsville neighborhoods of Brooklyn. *Id.* at 76-78, 97-98. At the time of Jordan's involvement, Eight Trey maintained significant operations at two hubs in Brooklyn: (1) the Vanderveer Projects in East Flatbush, also known as "Backwards"; and (2) the vicinity of Church Avenue and 48th Street, also known as "Forwards." *Id.* at 73, 78. Members of the gang

2

routinely held meetings at the Vanderveer Project, and they gathered from across the nation to meet in Brooklyn on "Eight Trey Day" on August 3rd (*i.e.*, the third day of the eighth month) of every year. *Id.* at 101-02.

A person may become a member of Eight Trey in one of three ways: (1) being "jumped in," *i.e.*, being beaten by four other gang members for eighty-three seconds; (2) "putting in work," *i.e.*, committing crimes such as murder, robberies, extortion, or selling drugs; or (3) being "blessed in," *i.e.*, being inducted by a high-ranking gang member. *Id.* at 78-79, 722-23. After joining the gang, Eight Trey members must adhere to gang rules. *Id.* at 99-101. For example, members may not cooperate with law enforcement authorities and must, according to Jordan, kill rival gang members—such as members of the Folk Nation gang (also known as the "Gangster Disciple" gang)—on sight. *Id.* at 99-101, 106-07, 139. Failure to adhere to gang rules may lead to a "violation," in which four members of the gang beat the violator for eighty-three seconds. *Id.* at 100. For severe violations, gang members may shoot or stab the violator or his or her family members. *Id.* The penalty for cooperating with law enforcement is death. *Id.* at 100-01.

Eight Trey members commit crimes together—including murder, robberies, assault, and sale of drugs—to increase their status, or "credit," within the gang. *Id.* at 104. For example, Jordan testified he committed 80 to 100 robberies with Jonathan Victor (also known as "Gotti"), another Eight Trey member who "blessed" Jordan into the gang. *Id.* at 90, 105-06, 723-24.[1] Members increase their status most substantially by committing murder and receive more credit both for more gruesome murders involving conduct such as torture or maiming and for murders of high-ranking rival gang members (*i.e.*, of "homies" or "big homies"). *Id.* at 104-05, 740-41.

---

[1] Jordan further testified he and Victor used firearms in 20 to 30 of those robberies. Tr. at 106.

To indicate their affiliation with the gang, Eight Trey members use certain hand symbols, have certain types of tattoos, wear blue and grey, and wear the logos of certain sports teams. *See* Tr. at 92-99. Gestures and symbols members use include: (1) making a "G," which stands for "gangsters," with their hands; (2) holding up three fingers to the side, which stands for "trey"; (3) making a "C" with two fingers, which stands for "Crip"; and (4) making a waving motion, which signifies "mov[ing] on everything" or being the "first to attack." *Id.* at 92-94. Eight Trey members also have a handshake wherein members make a "G" in either hand and connect them to make an eight. *Id.* at 94. In writing, members replace the letter "E" with the number "3" to signify their affiliation and the letter "B" with 8 or C both to signify their affiliation and to demonstrate their disrespect for the Bloods, an enemy gang. *Id.* at 94-95. Tattoos demonstrating membership include those of the letter "G" (for "gangsters"), the letters "ETGC" (for "Eight Trey Gangster Crips"), the letters "ETG" (for "Eight Trey gang"), the L.A. Dodgers or L.A. Clippers symbols (for the gang's origin), the Georgetown Hoya Bulldogs (for reference to the gang colors of blue and gray), and the numbers "8" and "3" (for "Eight Trey"). *Id.* at 95. Eight Trey members also wear clothing related to the Texas Rangers, Georgetown Hoyas, Georgia Bulldogs, L.A. Dodgers, and L.A. Clippers sports teams. *Id.* at 97.

Eight Trey Crips share a number of common phrases and terms. *See id.* at 98-99. For example, Eight Trey members refer to one another using—or add to the end of their names—the words "Lok" or "Loc," which stands for "Life of Crime," "Life of Crip," or "Living Off Cash." *Id.* at 80, 98. If a fellow gang member is killed, Eight Trey members say "TIP" (for "Trey in Peace"), "CIP" (for "Crip in Peace"), or "SIP" (for "Sleep in Peace"). *Id.* at 99. Eight Trey members wish one another a happy birthday with the phrase "Happy C Day," using the letter

4

"C," "[f]or Crip or disrespecting any other gang." *Id.* at 98. They wish one another a happy new year with the phrase "happy blue year" because of the gang's colors. *Id.* at 99.

## II. Defendant's Membership in the Eight Trey Crips Criminal Enterprise

The parties presented evidence about Defendant's membership in, and leadership of, Eight Trey. *Id.* at 70-71, 80, 84. Jordan testified Defendant, also known as "Biz," "Biz Loc," and "Molotovbizzz," had been "the OG" or "original gangster" of the Eight Trey Crips—the highest position in the gang—for ten to fifteen years by the time of the murder and perhaps "the biggest Crip member on the east coast." *Id.* at 71, 129. Jordan first met Defendant in late 2014 at the C-Pack club, now known as Pulse 48. *Id.* at 128. After Jordan met Defendant once more in early 2015 at Foster Park, an Eight Trey hangout close to the Vanderveers, they began to hang out every day, mostly drinking Hennessy, smoking, and gambling. *Id.* at 129-38, 182. Jordan testified other Eight Trey Crips treated Defendant "like he was God." *Id.* at 135.

Records of Defendant's Instagram account—with vanity name "Molotovbizzz" and entered into evidence by stipulation—contain extensive references to his affiliation with Eight Trey. *See, e.g.*, Gov't Exs. 403-C, 403-E, 403-G, 403-J–K, 403-Y; Tr. at 80-81, 408-25, 429-32. For example, on June 30, 2015, Defendant posted a picture of himself and others with his hand in the shape of a "C" and wrote: "Definition of Goon Squad. Some talk about it, some really DO IT. Empty barrels make the most noise, and cows know where weak fencez are. Free my loks 2cool and Yung Duce . . . #trayzandduces #83hunnit #wearevmg #gzmoveinsilence." Gov't Ex. 403-F; Tr. at 411-12. Similarly, an August 4, 2014 post—created one day after "Eight Trey Day"—contains a picture of Defendant holding a blue baseball cap with the letter "T"; an individual making the number three with his left hand; and Jamael Whittingham wearing a t-shirt displaying the Georgia Bulldogs mascot and a blue bandana and making a sign with his right

hand. Gov't Ex. 403-G; Tr. at 412-13. The caption references the number "83" and an individual "who stepped off the plane for the function STR8 from L.A." *Id.*

Other items law enforcement authorities seized from Defendant at the time of his arrest also indicate his affiliation with Eight Trey, as do text messages from both Defendant's and Philip's cell phones. *See, e.g.*, Gov't Exs 302A–E, 409-E, 409-Q, 409-R, 410-B. For example, a message found on Philip's phone sent 32 minutes before the shooting stated, "Big Tre in d building," meaning Philip believed a high-ranking Eight Trey member was in the Buda Hookah Lounge at 589 Flatbush Avenue (the "Lounge"). Tr. at 471.

Defendant also has several tattoos showing his gang membership. *See, e.g,* Gov't Exs. 104-B, 104-D–F, 104-H, 104-N, 104-R–U, 104W–Z; *see also* Tr. at 393-402. These included, among others, tattoos of the letters "E," "T", and "G," the numbers "8" and "3," the Roman numeral "III," the word "Crip," and an image of a hand in the shape of a "C." *See id.*

On August 16, 2015, Defendant received a call from an inmate at a New York City Department of Corrections Facility ("NYC DOC Facility"), during which he admitted, among other things, he started Eight Trey and was still loyal to the gang:

> Ain't nobody bigger than the set, and he certainly not bigger than the set . . . . He wouldn't even be for the set if I didn't start the set, cuz. All Eight Trey Gangstas, cuz. . . . I got loyalty to the set before anything cuz. . . . I'm talking about what's going on with whatever I started, cuz. Anything line, cowboy, killer gang, any, everything. All that shit is goin' with what I'm sayin'. Because it wouldn't exist if it wasn't for me.

Gov't Ex. 202-A; Tr. at 812.

## III. Other Members of the Eight Trey Crips Criminal Enterprise

The parties also presented evidence about other Eight Trey members. Jordan testified Defendant was the "OG," or leader, of Eight Trey, with respect to both the Vanderveer and Church Avenue hubs. Tr. at 71. Directly below Defendant in the gang's hierarchy were

Godfrey Grant, Brandon Malloy, Rodney Muschette, and Maliek Ramsey. *Id.* at 81-82, 85-87, 427-28.[2]  Grant and Malloy were "big homies" at the Vanderveer hub. *Id.* at 85-87. Muschette and Ramsey were "big homies" at the Church Avenue hub. *Id.* at 82, 85-87.

Other members of either Eight Trey or Nine Deuce PGC—a further subset of Eight Trey created by Defendant—included Theodore Merchant, Anthony Adams, Kyle Reneau, Ariel Ford, Javier Blackett, and Jamael Whittingham. *Id.* at 87-91, 427-28.[3]  Ford was the leader of Nine Deuce, of which Merchant, Adams, and Reneau were also members. *Id.* at 87-91, 103.  Other friendly gangs included the G-Stone Crips, Insane Gangster Crips, and Grape Street. *Id.* at 103.

Jordan spent time with Grant, Ford, Merchant, and Defendant in Foster Park almost every day beginning in February or March of 2015. *Id.* at 132-35.  He would also often spend time with Merchant, Adams, Blackett, and Defendant near Flatbush and Woodruff Avenues, where they would hang out and gamble. *Id.* at 133, 38.  Records from the Instagram accounts of Defendant, Jordan, and Whittingham showed Defendant and other members of Eight Trey associating with one another and relationships between Defendant and other members of the gang. *See, e.g.*, Gov't Exs. 403-F–G, 403-J, 404-C, 405-L, 405-O–P.  These records also suggest the above-named individuals' gang affiliations. *See, e.g., id.*

## IV.   Eight Trey's Rivalry with the Folk Nation Street Gang

The parties presented evidence about the rivalry between Eight Trey and Folk Nation. According to Jordan, Folk Nation—also known as the "Gangster Disciples" or "GD"—was Eight

---

[2] Grant was also known as "Bonton" and "Crill Gates"; Malloy was also known as "Killa"; Muschette was also known as "Stitch"; and Ramsey was also known as "Squinge." Tr. at 427-28.

[3] Merchant was also known as "Theo" and "T Loc"; Adams was also known as "Poppy"; Reneau was also known as "Deuce"; Ford was also known as "Too Cool"; Blackett was also known as "Gutta"; and Whittingham was also known as "Tiny Biz." Tr. at 427-28.

Trey's most significant rival. Tr. at 107. At the time of the shooting, Folk Nation operated primarily out of the Ebbets Field apartments in Brooklyn. *Id.* at 109. Like Eight Trey members, Folk Nation members display certain hand symbols, wear certain colors, and use certain phrases with one another. *Id.* at 109-11. For example, Folk Nation members often wear the colors black, grey, and white and display symbols such as the "pitchfork" and the "six trey." *Id.* at 109-110.

Eight Trey members use the term "Gangster disciple killer" or "GDK" to disrespect Folk Nation members. *Id.* at 110-11. Defendant once told Jordan, "it's GDK. Everyone is supposed to be that way on the Eight Trey Crips." *Id.* at 139. He also told Jordan it was "zero tolerance when it comes to Folk Nation. If they come with GDs, any Eight Trey Crips is supposed to move on them," *i.e.*, "[d]o whatever is necessary whenever you're around them, no matter what the setting or environment is. If you got a gun, shoot them, if you've got a knife, stab them; no matter who they're with or what they're doing. If you don't do that, then you're going to get violated by other gang members." *Id.* at 139. Thus, according to Jordan, Eight Trey members were generally instructed to kill Folk Nation members on sight. *See id.* at 100, 139. Jonathan Victor testified, however, some members of Eight Trey became members of Folk Nation and continued to visit and to live in Vanderveer without retribution. *Id.* at 434-36. Notably, Victor also testified he committed crimes with a member of the rival Bloods gang. *Id.* at 731-34.

The parties presented evidence about several violent incidents between the gangs. Jordan recounted shootings and instances of violence between 2008 and 2010, including one in which two Folk Nation members shot an Eight Trey member ten times and one in which a Folk Nation member shot and killed an Eight Trey member in a shootout on the roof of the Vandeveer projects. *See id.* at 119-23. Defendant told Jordan the Eight Trey Crips did not like Folk Nation

8

because a Folk Nation member named "Droppa" directed others to murder Defendant's close friend and fellow gang member, Jamal Hill, or "Twin," in Trinidad. *Id.* at 139-41.[4]

Between 2010 and 2014, Jordan testified he moved to Virginia to live with his father. *Id.* at 123. When he returned to Brooklyn,[5] "it was war" between Eight Trey and Folk Nation, "the same thing as it ever been." *Id.* at 127. For example, Jordan witnessed Folk Nation gang members shoot at an Eight Trey member's sister, and in another instance, a Crips set killed a Folk Nation member in front of a party. *Id.* at 127-28. And in the summer of 2015, according to Jordan, Defendant punched and stomped on a man who said he would get a gun from Folk Nation when Eight Trey members would not offer one. *Id.* at 142-43.

Social media postings also depict the Eight Trey–Folk Nation rivalry. For example, in one posting of a photograph dated August 6, 2018, Jamael Whittingham[6] wore a blue t-shirt bearing a photograph of Defendant. *See* Tr. at 441-43; Gov't Ex. 405-E. Below the photograph were references to Eight Trey and the letters "GDK." *Id.* In another posting, Whittingham wore a shirt with Eight Trey symbols and a blue bandana and made the gang's hand signal; on the right arm of Whittingham's shirt were the words "Folk Killa." Tr. at 449-50; Gov't Ex. 405-P.

The parties also presented cell phone records, including messages from Defendant's cell phone, pertaining to the Eight Trey–Folk Nation rivalry. In one text message, Defendant wrote:

---

[4] Two other Eight Trey members told Jordan "Twin had gotten killed in Trinidad and that Droppa sent money to somebody to get him killed." Tr. at 140-41. Defendant posted an image of an individual on his Instagram account with the message "Jamal Hill, in God's hands, in our hearts," and "TIP." Gov't Ex. 403-M. Eight Trey member Jamael Whittingham posted the same image on his Instagram account with the word "Twin" and the letters "RIP." Gov't Ex. 405-K; Tr. at 446-47. These were the only references to Hill or Twin on Defendant's or Whittingham's Instagram accounts. *Id.* at 527. There were no references to avenging Twin's death or to Philip on Defendant's Instagram account. *Id.* at 527-28. Jordan further testified an Eight Trey member named "Spazz" also told him, "the dude that got Twin killed had come through 48th and Church and shot at some Eight Trey gang members." *Id.*

[5] Jordan lived in Virginia for over three years. Tr. at 124. The first year, Jordan traveled back to Flatbush every weekend to sell firearms he obtained in Virginia. *Id.* During that time, he also committed robberies, home invasions, shootings, and grand larceny. He was arrested in Brooklyn in 2013 while "on the run for warrants . . . in Virginia." *Id.* at 125-26. When he made bail in Virginia, he "ran again," returning to Brooklyn in 2014. In Brooklyn, he and Jonathan Victor continued to commit robberies and to sell drugs together. *Id.* at 125-26.

[6] Detective Sivori testified he observed Whittingham in the gallery during Defendant's trial. Tr. at 440-41.

"I don't fucc with 60z or Killa lok. I don't bang 6 point starz either, I bang 3z and kill nappz and GDz crip." *Id.* at 537; Gov't Ex. 409-V.

## V.    Chrispine Philip's Affiliation with Folk Nation

The evidence presented at trial also included information about the victim, Chrispine Philip, also known as "Droppa," as a member of Folk Nation. Jordan testified: (1) he had never seen Philip before but knew who Philip was; (2) Philip was a known member of Folk Nation; (3) an Eight Trey member named "Spazz" told him Philip shot people at the Church Avenue hub; (4) Defendant and Spazz separately told Jordan "Twin had gotten killed in Trinidad and that [Philip] sent money to somebody to get him killed"; (5) Philip had a reputation for violence; (6) Philip was feared; (7) Philip was a contract killer; and (8) if Philip was around, someone would get shot. Tr. at 140-41, 165, 176-78. Jordan also identified a picture of Philip holding a coffee mug with a handle that looked like a gun. *Id.* at 166, 171; Def. Ex. C; Def. Ex. C1. Similarly, Trevon Lewis testified he grew up in East Flatbush in the 40s and Church Avenue, and he knew Philip—who lived in the same neighborhood—had a reputation for violence and killing people and was generally feared in the community. Tr. at 713-14.

The evidence also included records from Philip's Instagram account with vanity name "P.drop." *See id.* at 409. A caption in one post read: "bodied three niggas at the same damn time." Def. Ex. F-10; Tr. at 510. In another post, Philip wrote: "All my cases is dismissed. Always make sure ur lawyer on deck. Now dey can watch me spend that lawsuit money." Def. Ex. F-9; Tr. at 516. Philip's Instagram profile also contained photographs of a watch and diamond rings. *See* Def. Exs. F-6, F-12; *see also* Tr. at 524-26.

## VI.    Events of August 28, 2015

### A.    Testimony Regarding the Buda Hookah Lounge Shooting

10

Neil Jordan and Crystal Garner testified about what occurred inside the Lounge on August 28, 2015 at the time of the shooting. Trevon Lewis testified he invited Defendant to the Lounge as a local person of interest and told Defendant he would pay him with a "bottle" or cash to attend. Tr. at 709. According to both Jordan and Garner, the Lounge was small, and it was dimly lit that night. *Id.* at 24, 144. With respect to the layout of the Lounge, there were couches and tables on one side, a DJ booth on the other side, and a bar at the back. *Id.* at 24. Throughout the night, music was playing and people were dancing. *Id.* at 24-27, 187.

According to Jordan, at around 11:00 P.M., he and his girlfriend met Theo and Theo's girlfriend at the Lounge, went inside, and went to the second VIP section to meet Defendant, Anthony Adams, and others. *Id.* at 145-46. At the bar, they purchased three bottles of Hennessy. *Id.* at 146. And in the VIP section, the group drank alcohol and smoked marijuana. *Id.* at 147.

Philip and another individual entered the lounge later in the evening. *Id.* at 147. According to Jordan, Philip—whom Jordan described as light-skinned with dreadlocks and wearing a "fittie"—walked by and reached out his hand to greet Defendant. *Id.* at 147. Defendant looked at Philip's hand but did not shake it, and Philip kept walking past Defendant. *Id.* Defendant then told Jordan "that's the op"—*i.e.*, "the enemy, the opposition"—and "that's Droppa that got Twin killed in Trinidad." *Id.* at 147-48. Jordan left the lounge for a short time. *Id.* at 148. When he returned, Defendant's hat had been turned around with the brim faced forwards and pulled over his face. *Id.* Jordan testified Defendant appeared angry. *Id.*

According to Jordan, when Philip walked by Defendant to leave the Lounge, he attempted to bump into Defendant, who then pulled out a gun. *Id.* As Philip walked out, Defendant followed behind, pointed his gun towards Philip, and started shooting. *Id.* at 148-49. Jordan testified Defendant shot the individual walking behind Philip and then continued shooting

11

at Philip. *Id.* at 149. As Philip moved further towards the entrance, Defendant kept shooting. *Id.* When Philip fell to the floor, Defendant stood over him and kept shooting. *Id.* Defendant walked back towards his fellow gang members and fell over a table. *Id.* Adams then grabbed Defendant's gun, and Defendant ran out of the lounge. *Id.* at 149. After Jordan and his girlfriend exited the lounge and met up with Merchant and his girlfriend, Adams gave the gun to two other individuals. *Id.* at 149. In addition to his eyewitness testimony, Jordan testified while he was detained at Rikers Island in late 2015,[7] "Too Cool" told him the gang would retaliate if he told the authorities Defendant was responsible for the Buda Hookah shooting. *Id.* at 154.

Garner testified that during the shooting, she was shot in her arm and stomach, she was "kind of in shock," and she heard people "screaming and running" and "a lot of gunfire." *Id.* at 26. She then crouched down to the floor and saw somebody who was wearing a white shirt run past her with a gun. *Id.* After the shooting was over, medics took Garner to the hospital in an ambulance. *Id.* at 26-27.

## B.    Surveillance Video

By stipulation, the parties agreed to the admission of videotaped evidence from the Lounge and the surrounding area. *See* Def. Mem. at 7 & n.7.

Video footage showed Philip entering the Lounge with two other people before the shooting: a tall individual with a backwards hat, identified as Duane Josiah (also known as

---

[7] Jordan's criminal activities, recounted in part above, *see supra* note 5, continued into 2015 and 2016, ultimately resulting in his detainment at Rikers Island and, later on, his indictment on federal charges. In January 2015, Jordan was involved in a high-speed car chase with police and was arrested two weeks later for, among other things, causing injury to the police and possession of a firearm in the glove compartment. *Id.* at 152-54. In September 2015, Jordan was arrested for possession of a firearm. *Id.* at 152. Jordan was arrested on three other occasions in 2015 for assault, and he also committed fraud by "skimming." *Id.* at 153. In 2016, Jordan was arrested for driving with a suspended license. *Id.* at 154. In December 2016, Jordan pled guilty to federal crimes, including firearm-related offenses, two Hobbs Act robberies, and bank fraud pursuant to a cooperation agreement. *Id.* Jordan testified he understands he faces a statutory range of imprisonment of seven years to life and an advisory range of imprisonment of 125 to 135 months absent relief pursuant to United States Sentencing Guideline § 5K1.1. *Id.* at 189.

"Twenty"), and another individual identified as Brian Bohem. Gov't Ex. 601-F; Def. Ex. A; Tr. at 303-05, 495. After Philip entered, Defendant—who was wearing pants, a white t-shirt with a distinct design on it, and a blue baseball cap with the letter "T" on it[8]—stepped into an aisle through the Lounge, walked towards Philip and Josiah, and bumped into Josiah. Gov't Exs. 601-A–B; Tr. at 225-29. Defendant waited for Philip and Josiah to pass by before Defendant pulled out a gun, pointed it at Philip's back, and began to fire. *Id.* Defendant chased Philip to the front of the Lounge, firing towards Philip's head. *Id.* When Philip fell to the floor, Defendant leaned over him and continued shooting him. *Id.* Defendant then moved towards the back of the Lounge, handed something to Adams, and ran outside, turning south on Flatbush Avenue. *Id.*[9]

After Defendant shot Philip, Josiah went outside, making gestures and moving around. Tr. at 311-12. Josiah then went back inside the Lounge to where Philip's body was on the ground and appeared to put his hands on and to shake Philip's body. *Id.* at 306-07. Detective Siek, who described the video evidence, agreed it was "possible" Josiah was taking something off Philip's body. *Id.* at 307. Robert Brennan—an expert in the possession and handling of handguns—testified the video showed Josiah collecting something from the floor next to Philip's body, placing it in his rear pants pocket, leaving the Lounge, and ultimately re-entering the Lounge assuming a "defensive" posture characteristic of someone carrying a weapon. *Id.* at 760-61. Brennan noted Josiah at one point appeared to have "something in his hands" and was moving as if to "rack a round" into a semi-automatic gun. *Id.* at 762. Josiah then exited the Lounge once more and turned left. Gov't Ex. 602-N; Tr. at 308-09, 762-63. As he ran down Rutland Road, he adjusted his waistband and placed his hand in his right rear pocket. *Id.* at 763.

---

[8] The video shows Defendant initially wore his hat backwards and later turned it forwards. Gov't Ex. 601(h).

[9] Defendant notes "the videotape did not show: Philip extending his hand to [Defendant] upon his entrance to the lounge or that [Defendant] shot at Josiah." Def. Mem. at 5-6.

He appeared to drop something on Rutland and returned to the Lounge again. Gov't Ex. 602-N; Tr. at 308-09, 762-63. Brennan testified he believed Josiah was hiding a weapon. Tr. at 764.

Meanwhile, Defendant fled south on Flatbush Avenue from the vicinity of the Lounge to Parkside Avenue, where he turned east. Gov't Exs. 102-F, 601-B, 602-A–B, 603-A, 603-B–F, 604-A, 605-A–B; Tr. at 208-13. At this time, Defendant removed and discarded two articles of clothing he wore during the shooting: the blue baseball cap and the white t-shirt. Gov't Exs. 603-D, 604-A; Tr. at 229-244. He wore a white tank top, and distinct tattoos were visible on his body.[10] Tr. at 244-52, 535. Defendant later arrived at his apartment building wearing a white tank top and pants, appearing identical to the clothes worn by the individual fleeing the Lounge down Flatbush Avenue. Gov't Ex. 606-A, 606-C, 503; Tr. at 250-53.

### C. Law Enforcement Response at the Scene and Subsequent Investigation

NYPD Officer Luis Lopez testified he heard a report of shots fired at 589 Flatbush Avenue while patrolling the 71st Precinct on August 28, 2015. *Id.* at 345-46. When he arrived at the scene, patrons were rushing out of the Lounge through the door and front window, which had been "broken out." *Id.* at 347. Inside, Officer Lopez saw Philip on the floor bleeding. *Id.* at 348. Emergency Medical Services arrived and removed Philip to Kings County Hospital. *Id.* at 348-49. Officer Lopez later saw Philip at the morgue. *Id.* at 349.

NYPD Detectives Andre Bovell and Lucasz Siek also responded to the scene. *Id.* at 33, 36, 215. Detective Bovell photographed the location and collected a bullet fragment from the floor. *Id.* at 44-53. Detective Siek collected the video evidence from the Lounge, surrounding businesses, surrounding residences, and NYPD cameras. *Id.* at 215-24. An NYPD officer also

---

[10] The videos showed a "G" on Defendant's neck, a "G" on his left arm, an "8" on his left triceps, a "3" on his right triceps, and other tattoos on his left shoulder, which matched the photographs taken on September 29, 2015. *Compare* Gov't Ex. 605-B, *and* Tr. at 248-49, *with* Tr. at 261-66, *and* Gov't Exs. 102-H–G, 104-B, 104-H, 104-M, 507.

recovered a Taurus .38 caliber pistol recovered in front of 5 Rutland Road, where the video evidence shows Josiah appearing to drop something. Def. Ex. D; Tr. at 286-87, 310.

Dr. Sean Kelly, who conducted Philip's autopsy, testified a gunshot wound to the head caused Philip's death. Tr. at 322-24, 340. He also testified Philip was shot three times: once in the back of the scalp, once on the left side of the scalp, and once on the left, lower back. *Id.* Dr. Kelly further testified the gunshot wounds on the back of Philip's scalp and left, lower back were the result of shots "from behind" Philip, and the gunshot wound on the left side of Philip's head was the result of shots from the side and the back. Gov't Ex. 100-C–E, 100-H, 100-H, 100-L–M; Tr. at 324. The autopsy team recovered a bullet from Philip's head. Tr. at 332. Dr. Kelly did not identify tattoos of a pitchfork, the number six, the number 74, or the letter B-O-S on Philip's body. *Id.* at 341-42. Neither the bullet recovered from Philip's head nor the bullet recovered from the scene were fired from the Taurus .38 found in front of 5 Rutland Road. *Id.* at 287-88.

## VII.   Defendant's Statements After the Shooting

Two days after the shooting, Jordan saw Defendant, Theo, and other gang members in Foster Park. *Id.* at 150. At that time, Defendant said to the group "I had to shoot him up." *Id.* at 151. Defendant then told Theo, "[Y]o, I did that shit," to which Theo responded, "[Y]ou did some John Wayne shit," to which Defendant replied, "[Y]eah, I did. I did some John Wayne shit." *Id.* Two weeks later, Jordan saw Defendant at Albany Manor, another Brooklyn night club. *Id.*[11] Defendant told Jordan his supervised release officer was calling for him to come in, and he would not go because he thought he was being called due to the shooting at the Lounge.[12]

---

[11] A message from Defendant's cell phone on September 5, 2015 stated he was at "Albany Manor." *See* Gov't Ex. 409-F; Tr. at 464.

[12] The parties stipulated Defendant served a three-year term of supervised release from August 2013 to August 2016. Gov't Ex. 510; Tr. at 465. On September 3, 2015, Defendant's mother texted him to ask if "[e]verything went okay at parole." Tr. at 465. Defendant responded, "yes." *Id.*

On June 12, 2017, Detective John Sivori arrested Defendant. *Id.* at 477. After Detective Sivori advised Defendant of his *Miranda* rights, Defendant agreed to speak with him. *Id.* at 477-78. Detective Sivori did not take notes of or otherwise record Defendant's statements. *Id.* at 533. He told Defendant a video camera captured him shooting someone and throwing a hookah at him. *Id.* at 478. Defendant responded he did not throw a hookah at anyone and stated he had heard or seen on the news the victim had a gun on him. *Id.* Detective Sivori also asked Defendant about Twin's death in Trinidad, to which Defendant responded, "whatever [the officers] were hearing on the streets is what happened to Twin." *Id.*

Law enforcement officers also recovered from Defendant's possession a letter, which read in part as follows:

> Lord God
>
> [redacted]
>
> Forgive me for [six crossed-out words]
>
> Please don't let the feds take or gain jurisdiction of the matter; Please let them make the matter disappear [sic] never to be prosecuted or mentioned in this lifetime. Please take total control of the situation & make the situation disappear never to be prosecuted or mentioned in this lifetime.
>
> [redacted]
>
> Please don't let the DA (state or feds), the prosecution ([redacted]), the Brooklyn South Homicide division, any federal magistrate or grand jury in this life time or federal agent [redacted] [crossed out words] any of their co-workers, underlings, superiors, bosses or supervisor unseal any indictments on me. Please don't let there be any sealed or secret indictments laying dormant for me[.]
>
> Please let no investigation on me by the state or feds (past, present or future) be successful. Let them always get stumped. Let no information on me hold any credibility. Let nobody provide them any statements or ID me on any crime scene or implicate me on anything.
>
> Please don't let them indict me on <u>any</u> Rico, racketeering, conspiracy of any sort, guns, drugs, murder or robbery.

> Please don[']t let Marlon, Malik, Rodney, Godfrey, Theo, Lil Gotti[,] Poppy or
> anybody that can hinder my freedom with any information, be working or
> cooperating with the government or any law enforcement.

Gov't Ex. 301-A; Tr. at 480-82. Each of the names referenced in the letter—Malik, Rodney,

Godfrey, Theo, Lil Gotti, and Poppy—match those of members of the Eight Trey Crips and/or

Nine Deuce PGC, the subset of Eight Trey Defendant established. Tr. at 86-88, 91-92, 483-84.

Jordan, Theo, and Poppy were all inside the Lounge at the time of the shooting. *Id.* at 145, 150.

Expert in questioned documents Rachel Clay testified she examined the note with

specialized tools used to uncover obliterated writing. She determined the six crossed-out words

in the portion of the note that read "Forgive me for [six crossed-out words]" were best read as

"taking the life of ChRi_piNE P__llip." Tr. at 569-72; Gov't Ex. 419.

Through the testimony of Detective Sivori, the Government introduced additional

statements about the shooting such as calls from inmates at an NYC DOC facility. *See* Gov't

Exs. 202, 506; Tr. at 403. In an August 28, 2015 call from Kyle Reneau to Theodore Merchant

hours after the shooting, Reneau asked Merchant about the shooting: "Who the hell? Opp,

oppas? Oppas?" Gov't Ex. 202B; Tr. 407-08. Merchant responded, "Yeah, that's a fact. Them

dizzy niggas," a reference to Folk Nation. *Id.* Reneau later noted, "My nines, G-S nines in here

gonna love that shit. They gonna love that shit when I tell them that," a reference to Nine Deuce,

to which Merchant responded, "They was in the spot too." *Id.*

## VIII. The Justification Jury Instruction

At trial, the Court charged the jury the Government was required to prove beyond a

reasonable doubt Defendant's killing of Philip was not justified. The Court instructed the jury

Defendant would be justified in killing Philip if: (1) "the defendant . . . actually believed that

Chrispine Philip was using or about to use deadly physical force against him, and that the

defendant's own use of deadly physical force was necessary to defend himself from it"; and (2) "a reasonable person in the defendant's position, knowing what the defendant knew and being in the same circumstances, would have had those same beliefs." Tr. at 956-57. The Court also instructed the jury it may consider evidence regarding Philip's reputation for violence and his prior violent acts in determining whether Defendant reasonably believed deadly physical force was necessary. *Id.* at 957-58. The Court cautioned, however, Defendant would not be justified if he was the initial aggressor of deadly physical force or could retreat safely. *Id.* at 958-59.

## DISCUSSION

Defendant argues this Court should enter a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or, in the alternative, order a new trial pursuant to Rule 33, because "[t]he government did not introduce sufficient evidence to allow the jury reasonably to infer that the murder was other than self-defense, thus negating two necessary elements of the charged offense." Def. Mem. at 16-19. Defendant alternatively argues the interest of justice requires a new trial because the jury should not have heard the testimony of Crystal Garner, which was both irrelevant and unfairly prejudicial. *Id.* at 19-20. The Government, on the other hand, argues Defendant is entitled neither to a judgment of acquittal nor a new trial because: (1) the jury correctly found Defendant did not act in self-defense; and (2) Crystal Garner's testimony was both relevant and non-prejudicial. Gov't Mem. at 22-28.

## I. Rule 29 Motion for Judgment of Acquittal

### A. Applicable Law

Rule 29(c)(2) of the Federal Rules of Criminal procedure permits a court to set aside a jury's guilty verdict and enter a judgment of acquittal based on the insufficiency of the evidence presented at trial. A defendant challenging the sufficiency of the evidence carries "a very heavy

burden." *United States v. Nusraty*, 867 F.2d 759, 762 (2d Cir. 1989) (internal quotation marks and citation omitted). In deciding a Rule 29 motion, a court must "view the evidence in the light most favorable to the government and construe all possible inferences in its favor." *United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991) (internal quotation marks and citation omitted). Courts generally "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Velasquez*, 271 F.3d 364, 370 (2d Cir. 2001) (internal quotation marks and citation omitted). To prevail, a defendant must demonstrate "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted).

**B. Analysis**

Defendant argues he is entitled to a judgment of acquittal because "there was ample proof in the record that [he] believed Philip was about to use deadly force against him." Def. Mem. at 16-17. He contends there was insufficient proof both that Eight Trey members killed Folk Nation members on sight and that Defendant sought to avenge the death of Jamal Hill. *Id.* at 18-19. Thus, according to Defendant, the Government "failed to prove that Philip's death was unjustified" or that Philip was "killed for the general purpose of maintaining or increasing [Defendant's] position in [Eight Trey]." *Id.* at 18 & n.8. The Government, on the other hand, argues the evidence supports the jury's verdict. Gov't Mem. at 22-25. The Court agrees.

Defendant points to several items in the trial record to suggest the Government failed to demonstrate beyond a reasonable doubt that Defendant was not justified in killing Philip and that Defendant killed Philip to maintain or to further his position in Eight Trey. As proof of Defendant's subjective belief Philip was about to use deadly force against him, Defendant notes

19

the following: (1) Trevon Lewis's testimony Philip was generally violent and a murderer; (2) Jordan's testimony about Philip's violent acts, including Hill's death in Trinidad and a shootout with Eight Trey members at the Church Avenue hub, and his general reputation for violence; (3) Jordan's and Victor's testimony about gang members receiving credit for killing high-ranking gang members, such as Defendant; and (4) Philip's Instagram.  As evidence Philip intended to act in accordance with his reputation, Defendant also identifies: (1) Lewis hired Defendant to attend the party and made Defendant's presence known to the public to encourage greater attendance; (2) the fact Philip went to the Lounge with Josiah and Bohem; (3) evidence Philip and Josiah may have possessed firearms; (4) the fact the Lounge had only one entrance or exit; and (5) the fact Bohem left through that exit before Defendant sought to leave.  Defendant also suggests Philip initially appeared to confront him and "brushed" up against him and thus was the initial aggressor.  *See* Def. Mem. at 17-18.

The Court finds the testimony of Neil Jordan sufficient on its own to sustain Defendant's conviction under Rule 29.  Jordan testified about each of the essential elements of the offense, including that Defendant was not justified in killing Philip and that Defendant killed Philip to maintain or increase his position in Eight Trey.  Jordan testified that just before Defendant killed Philip, Defendant identified Philip as "the op" and "Droppa that got Twin killed in Trinidad." He testified Eight Trey members were expected to commit acts of violence against Folk Nation, or they would otherwise risk being "violated" by other Eight Trey members.  And he testified Eight Trey members gained status or enhanced their reputation in the gang by committing acts of violence, including murder, for which members received the "highest" amount of credit.

To the extent Defendant complains Jordan's "testimony did not withstand heightened scrutiny," such attempts to undermine a witness's credibility are not appropriate on a Rule 29

motion. Under Rule 29, the Court must "defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses . . . and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Hamilton*, 334 F.3d 170, 179-80 (2d Cir. 2003) (internal quotation marks and citations omitted); *see also United States v. Valle*, 807 F.3d 508, 529-30 (2d Cir. 2015) ("In making this determination, a court must defer to the jury's resolution of evidentiary conflicts.").

The Government also introduced ample evidence corroborating Jordan's testimony and supporting Defendant's guilt, including, among other things, surveillance video of the shooting, Defendant's and other Eight Trey members' social media posts, and Defendant's written and oral statements. The surveillance video vividly shows Defendant shot Philip from behind and kept shooting. Chronologically, the video shows:

- Shortly before Defendant killed Philip, but after Philip had already entered the Lounge, Defendant left the Lounge for some period of time and then came back, returning to the booth where he was surrounded by his fellow gang members, hanging out, and dancing.

- As Philip approached the area where Defendant was standing surrounded by his fellow gang members, Defendant stepped away from his crew and intentionally walked towards Philip's friend, Duane Josiah, bumping into him.

- After Philip and Josiah passed Defendant, Defendant pulled out a gun and started shooting at Philip from behind, following him to the front of the Lounge and down to the ground, where Defendant shot him in the head.

- Anthony Adams, another Eight Trey member, calmly watched Defendant shoot Philip as everyone else in the Lounge was surprised by the violence and ducked for cover. After Defendant killed Philip, Adams took Defendant's gun.

This evidence therefore suggests: (1) Defendant was able to leave the Lounge without provocation while Philip was present and therefore could have fled; (2) Defendant was the initial provocateur; (3) Defendant had an opportunity to flee while Philip was on the floor, before

Defendant fatally shot him in the head; (4) Defendant intended to kill Philip; and (5) Adams knew about Defendant's plan to kill Philip before it occurred.

The jury also reviewed Defendant's handwritten note, where Defendant asks forgiveness for—according to expert in questioned documents, Rachel Clay—"taking the life of ChRi_piNE P__llip." Defendant's request for forgiveness suggests Defendant subjectively believed he was not justified in murdering Philip. Defendant's written pleas that the Government never "take or gain jurisdiction of the matter" and that the matter "disappear [sic] never to be prosecuted or mentioned in this lifetime" also suggest he was aware he was not justified in murdering Philip.

The record also included Instagram posts in which Defendant and other Eight Trey members mourned the death of fellow Eight Trey member, Jamal Hill and statements suggesting Philip played a substantial role in Hill's murder. These posts and statements were further supported by testimony from Jonathan Victor, who testified gang members could increase their status within the gang by murdering of rival gang members. *Id.* at 740-41. Evidence showed Defendant's fellow gang members celebrated Defendant for killing Philip, and Defendant bragged he "did some John Wayne shit." Similarly, in a recorded conversation, Kyle Reneau opined the fellow members of his subset, Nine Deuce, were "gonna love that shit." Taken together, this evidence is sufficient for a jury to find Defendant killed Philip to avenge a fellow gang member's death and to further or maintain his status in Eight Trey, and not in self-defense, and therefore to find Defendant guilty of murder-in-aid-of-racketeering.

The jury considered and weighed all the evidence in determining Defendant was guilty of the crime charged. Indeed, the jury considered whether Defendant subjectively believed he faced mortal danger from Philip, and it squarely rejected that notion. Rather, the jury found Defendant was not justified in killing Philip and Defendant murdered Philip to maintain or

22

advance his position in Eight Trey. The Court sees no reason to disturb the jury's finding.

Ultimately, Defendant failed to meet his heavy burden of establishing "no rational trier of fact

could have found the essential elements of the crime charged beyond a reasonable doubt."

*Velasquez*, 271 F.3d at 370 (internal quotation marks and citation omitted). For these reasons,

Defendant's Rule 29 motion for a judgment of acquittal is denied.

## II.    Rule 33 Motion for a New Trial

### A. Applicable Law

Rule 33 of the Federal Rules of Criminal Procedure permits a court, on a defendant's

motion to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed.

R. Crim. P. 33(a). "[A] defendant bears the burden of proving that he is entitled to a new trial

under Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). In deciding a

Rule 33 motion, a court must consider "whether 'it would be a manifest injustice to let the guilty

verdict stand.'" *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007) (quoting *United States

v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). Courts grant Rule 33 motions for a new trial

"only in extraordinary circumstances," where there is a "real concern that an innocent person

may have been convicted." *McCourty*, 562 F.3d at 475 (internal quotation marks and citation

omitted). Indeed, the Second Circuit has cautioned courts should grant relief pursuant to Rule 33

"sparingly" and "with great caution." *Sanchez*, 969 F.2d at 1414.

### B. Analysis

Defendant moves for a new trial because: (1) the jury's verdict was contrary to the weight

of the evidence; and (2) the testimony of Crystal Garner prejudiced the jury against Defendant.

*See* Def. Mem. at 16-20.

#### 1. *Weight of the Evidence*

23

Defendant first moves for a new trial on the ground the jury's guilty verdict is contrary to the weight of the evidence based on the same arguments in support of his motion for acquittal, noting to the extent the Court's ruling "depends on the credibility of Jordan or the weight of the evidence, a new trial should be ordered." Def. Mem. at 16-19.

The Supreme Court has noted the distinction between a Rule 33 motion for a new trial based on the weight of the evidence and a Rule 29 motion for acquittal based on the sufficiency of the evidence:

> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, . . . [t]he district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982) (internal quotation marks and citation omitted). Although a court may consider the credibility of witnesses and weight of the evidence in assessing a Rule 33 motion, "[a] Rule 33 motion is not an opportunity for the district court to alter its general posture of deference 'to the jury's resolution of conflicting evidence and assessment of witness credibility.'" *United States v. Van Manen*, 18-CR-30, 2019 WL 5092013, at *2 (S.D.N.Y. Oct 11, 2019) (Crotty, J.) (quoting *McCourty*, 562 F.3d at 475). Rather, it is appropriate for a district court to invade the jury's province of assessing credibility only upon "'exceptional circumstances,'" such as for example, "'where testimony is patently incredible or defies physical realities.'" *McCourty*, 562 F.3d at 476 (quoting *Sanchez*, 969 F.2d at 1414). Even when a court discredits certain testimony or evidence, the core inquiry remains whether, based on the totality of the evidence presented at trial, there exists "a real concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414-15 (holding a new trial

was not warranted even assuming three witnesses provided perjured testimony because "it could not be said that the jury probably would have acquitted in the absence of false testimony").

To the extent Defendant argues Jordan's testimony was not credible, it was amply corroborated by, as noted *supra*, surveillance video, social media posts, Defendant's written and oral statements, and other testimony and evidence in the record. Defendant specifically takes issue with the inconsistency between Jordan's claim Eight Trey members were to kill rival gang members on sight and: (1) Victor's testimony some Folk Nation members peacefully visited the Vanderveer Projects; (2) Victor's testimony he committed crimes with a member of the Bloods gang; and (3) Defendant's August 16, 2015 conversation with an inmate at a NYC DOC Facility, in which Defendant did not suggest an Eight Trey member with "lines" to Folk Nation should be punished. Even with these inconsistencies in mind, "[t]he testimony . . . was not so patently incredible or defiant of physical realties as to justify intrusion upon the jury's verdict." *McCourty*, 562 F.3d at 476. It was well within the purview of the jury to resolve evidentiary discrepancies: "The jury was entitled to assess and weigh the credibility of these [witnesses] and make the necessary findings that it did." *Id.* at 477.

Similarly, to the extent Defendant argues the weight of the evidence necessitates a new trial, the record supports the jury's verdict. Defendant relies on: evidence of Philip's general reputation for violence; Jordan's testimony Philip was a "contract killer" who engaged in violence; Philip's Instagram posts; Victor's testimony no one ordered a hit on Philip; the fact Defendant had only one picture of Hill on his Instagram profile following Hill's death; and the fact Philip went to the Lounge with other people, who may have had guns. Again, the jury considered this evidence and found beyond a reasonable doubt Defendant did not act in self-defense and was not justified in killing Philip. Rather, the jury found beyond a reasonable doubt

Defendant killed Philip for the purpose of maintaining or furthering his position in Eight Trey. With the evidence of record in mind, the Court has no "real concern that an innocent person may have been convicted." *Id.* at 477. The Court therefore sees no reason to disturb the jury's verdict on this ground.

### 2. *Testimony of Crystal Garner*

Defendant next moves for a new trial because the testimony of Crystal Garner was irrelevant and prejudiced the jury against Defendant. Specifically, Defendant argues Garner "did not witness the shooting and had no testimony bearing on the movements of [him] or Philip inside the lounge or their interaction generally." Def. Mem. at 20. With respect to prejudice, Defendant argues "it was entirely possible that the jury found Mr. Pagett's justification defense winning as to Philip . . . , but voted to convict anyhow for the harm and terror he caused Garner." *Id.* According to Defendant, this "error was so egregious as to warrant a new trial." *Id.* The Government, on the other hand, argues Garner's testimony was relevant and neither confusing nor unfairly prejudicial. Gov't Mem. at 26-28. The Court agrees.

Rule 401 of the Federal Rules of Evidence defines evidence as "relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Under Rule 403, a court may nevertheless exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

First, Garner's testimony was undoubtedly relevant. Garner described the layout of the Lounge and testified there was a lot of gunfire, people were screaming and running, she saw a person with a gun wearing a white shirt—as Defendant was wearing—run past her, and she was

shot. Garner's testimony helped the jury understand what the surveillance video showed by explaining the layout of the Lounge at the time of the shooting, identifying what the shooter was wearing, and, critically, corroborating the testimony of Neil Jordan, whose credibility the defense has put squarely at issue. *Cf. United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987) (holding a basis for admitting other-act evidence is to "corroborate crucial prosecution testimony" if the corroboration is "direct and the matter corroborated is significant"). Garner's testimony captured what the silent surveillance camera could not: the sounds she heard from within the Lounge and the interactions among customers outside the camera's purview. For the same reasons, Garner's testimony was highly probative of the events of and circumstances surrounding August 28, 2015.

Second, Garner's testimony was neither unduly prejudicial nor confusing to the jury. Garner's testimony was brief, amounting to only about ten pages of the final transcript. Importantly, the Government did not elicit testimony from Garner regarding the period after she sought help from the medical professionals who arrived at the Lounge after the shooting. Nor did the Government elicit testimony about Garner's continued pain and suffering and years of physical therapy following the shooting.[13] Garner's testimony was appropriately limited to events leading up to the shooting, the shooting itself, and the immediate aftermath of the shooting. Garner's testimony was limited to the facts and issues of this case and did not unfairly excite emotions against Defendant. In sum, the probative value of Garner's testimony substantially outweighed any purported prejudice to Defendant.

The Court previously denied Defendant's motion to exclude Garner's testimony under Rules 401 and 403. *See* October 15, 2018 Order; *see also* ECF Nos. 71, 72, 76. Defendant's

---

[13] Indeed, Defendant objected to such testimony in his initial motion in *limine* seeking to preclude Garner as a witness. *See* ECF No. 71.

present Rule 33 motion insisting the Court should have precluded Garner's testimony essentially asks this Court to reconsider its prior ruling. The Court declines to do so.

In any event, even if it was error to admit Garner's testimony under Rules 401 and 403, the admission of Garner's testimony at trial did not result in "manifest injustice." Based on the facts set forth above, again, the Court has no "real concern that an innocent person may have been convicted." To the contrary, the evidence of record showed Defendant, a leader of the Eight Trey Gangsta Crips, killed Philip, a member of a rival gang, by repeatedly shooting him from behind and without provocation inside a crowded bar. The evidence further demonstrated Defendant bragged about killing Philip, and Defendant's fellow gang members celebrated him for it. This evidence, along with the remainder of the evidence of record, satisfies the elements of the charge at issue: murder-in-aid-of-racketeering. The Court therefore denies Defendant's motion for a new trial.

## CONCLUSION

For the foregoing reasons, Defendant's motion for a judgment of acquittal, and in the alternative for a new trial, is DENIED in its entirety. The Clerk of Court is directed to terminate the motion pending at ECF No 95.

**SO ORDERED.**

s/WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: November 8, 2019
Brooklyn, New York