UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,          :
         :
       v.          :     **MEMORANDUM & ORDER**
         :     17-CR-306-1 (WFK)
LARRY PAGETT,          :
         :
        Defendant.          :
------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

Larry Pagett ("Defendant") was found guilty of Murder in-Aid-of Racketeering in violation of 18 U.S.C. § 1959(a)(1) following trial. The Court now sentences him and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress contained in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is sentenced to life imprisonment to be followed by five (5) years of supervised release.

## BACKGROUND

The indictment in this case charges that on August 28, 2015, Defendant, together with others, for the purpose of maintaining and increasing his position in the Eight Trey Crips, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Chrispine Philip, in violation of New York Penal Law §§ 125.25(1) and 20.00, both in violation of 18 U.S.C. § 1959(a)(1). *See* Presentence Investigation Report ("PSR") ¶ 1.

The Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## DISCUSSION

**I.**     **Legal Standard**

18 U.S.C. § 3553 outlines the procedures for imposing sentence in a criminal case. The "starting point and the initial benchmark" in evaluating a criminal sentence is the Guidelines sentencing range. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a district court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in

1

open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form[.]" *Id.*

"The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.). Section 3553(a) provides a set of seven factors for the Court to consider in determining what sentence to impose on a criminal defendant. The Court addresses each in turn.

## II. Analysis

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

#### a. Family and Personal Background

Defendant was born Lawrence Hugh Pagett on September 26, 1979, in Brooklyn, New York to the consensual union of Leslie Pagett and Myrna Tasher. PSR ¶ 34. In 1987, his parents separated, and his father relocated to California. *Id*. Defendant's father (64), a hospital worker, now lives in Queens with his wife Linda (last name unknown). *Id*. Defendant reported his relationship with his father and stepmother has always been distant, and also reported to the United States Probation Department ("Probation") that his father physically abused him and his

mother. *Id.* ¶ 37. However, Defendant noted there "are no hard feelings" between them, as both the father and stepmother have been emotionally supportive during his incarceration. *Id.* ¶ 34. Defendant's mother (62), a nurse, resides in Brooklyn with Defendant's younger sister, who is also a nurse. *Id.* Defendant has always maintained close ties with his mother and his sister; furthermore, both are aware of Defendant's conviction for the instant offense and remain supportive. *Id.* ¶ 35–36. Defendant's mother communicated to Probation that Defendant was reared under lower income economic conditions, in a household devoid of violence or problems with drugs or alcohol. *Id.* Defendant is not close to his four paternal half-siblings, but Defendant noted they continue to stand by him despite his conviction for the instant offense. *Id.* ¶ 36.

In 1997, at age 20, Defendant attended Johnson and Wales University in Providence, Rhode Island, but returned to Brooklyn in 1998 because he could no longer afford tuition. *Id.* ¶ 38. When he was paroled from state custody in March 2005, he resumed living with his mother and sister in Brooklyn, living there until his incarceration for the prior federal offense in April 2006. *Id.* ¶ 39.

Defendant has never married, but has three children from prior relationships. *Id.* ¶ 40. Kerry McFee (21), was born from his former relationship with Hasha McFee (38), a patient aide, with whom he has an amicable relationship. *Id.* Ms. McFee is aware of the instant offense and remains supportive. *Id.* Defendant was incarcerated throughout most of his son's life, but formed a closer relationship with him when he was released. *Id.* Defendant also paid child support on a voluntary basis, sometimes aided by his mother. *Id.* Defendant reports his son stands by him despite the instant conviction. *Id.*

3

Defendant's daughter, Shardonay Pagett (24), a medical student, was produced from Defendant's romantic union with Tahira Alleyne (41), a medical billing clerk residing in Brooklyn. *Id.* ¶ 42. Defendant noted his relationship with his daughter was somewhat distant when she was younger, but indicated their relationship has "flourished" in the past few years. *Id.* Defendant also advised that he provided his daughter with the "basic necessities," although in 2008 Ms. Alleyne indicated Defendant never provided any means of child support. *Id.* Defendant noted he maintains regular telephone contact with his daughter, who is supportive despite the instant conviction, and continues to maintain an amicable relationship with Ms. Alleyne. *Id.* However, Defendant did not provide contact information for Ms. Alleyne or their shared daughter for the current presentence investigation. *Id.* In the 2008 felon in possession investigation, Ms. Alleyne communicated that their daughter was deeply affected as a result of his arrest for the prior federal offense, which left the daughter "devastated," "traumatized," and in need of counseling. *Id.* ¶ 43. The Probation Department was not able to reach Shardonay Pagett. *Id.*

Defendant's youngest child, Skylar Pagett (6), resides with her mother, Ikeytia Willie (40), in Brooklyn. *Id.* ¶ 44. Defendant continues to have a romantic relationship with Ms. Willie, a freelance hair stylist. *Id.* The couple's daughter has sickle cell anemia and suffers from recurring joint pain associated with the illness. *Id.* Although incarcerated for his youngest daughter's entire life, Defendant reports he maintains regular contact with her through phone calls and visit to the MDC. *Id.* Ms. Willie remains supportive of Defendant despite his conviction for the instant offense. *Id.* ¶ 45.

Defendant has been in federal custody since September 2015. *Id.* ¶ 46. SENTRY records indicate that while Defendant has been incarcerated at the MDC, he has incurred infractions for "interfering with staff" and "fighting with another person." *Id.* ¶ 47.

        b.      <u>Defendant's Physical Condition, History of Substance Abuse</u>

Defendant is in generally fair physical health. Defendant has a history of asthma and uses an inhaler as needed. *Id.* ¶ 49. Defendant has experienced various hospitalizations related to being struck by a motor vehicle, gunshot wounds, and a stabbing, but has fully recovered from these injuries. *Id.* ¶ 50. Defendant reports experiencing feelings of depression as a child relating to his father's absence, but has never sought counseling. *Id.* ¶ 52.

Defendant reported that he first experimented with alcohol and marijuana in 1990, at the age of 13. *Id.* ¶ 54. Defendant also related that as a condition of his parole, in March of 2005, he successfully completed treatment at the Realization Center in Brooklyn, New York. *Id.* ¶ 54. All urinalysis screenings conducted by the Probation Department during his prior supervised release term tested negative for the presence of illicit substances. *Id.*

        c.      <u>Legal History, Nature of Offense</u>

Defendant has been a long-standing member and leader of the Eight Trey Crips criminal enterprise, which has operated in the East Flatbush neighborhood of Brooklyn, New York, since approximately 1999. *Id.* ¶ 3. Defendant was a participant in the rivalry between the Eight Trey Crips and the Folk Nation. *Id.* Defendant asserted Folk Nation "got a close friend of his killed in Trinidad, a dude named Twin [Jamal Hill] who was another Eight Trey gang member" and "a dude named Droppa," who was "in GD," was the one who had Twin killed on March 26, 2015. The rival gang member (Droppa) was identified as Chrispine Philip. *Id.* In retaliation for the murder of Hill, Defendant planned the killing of Chrispine Philip. *Id.*

5

According to surveillance video and witness testimony, Defendant's murder of Philip was intentional and premediated. *Id.* ¶ 7. On August 28, 2015, at 1:40 A.M., Defendant, wearing blue jeans, a white t-shirt and a royal blue hat, along with several of his gang associates, entered the Buda Hookah Lounge located at 589 Flatbush Avenue in Brooklyn, New York. *Id*. While they were in the lounge, Philip walked by and reached out his hand to greet Defendant. *Id*. Defendant looked at Philip's hand, but did not shake it, and Philip kept walking. *Id*. After Philip walked by him, Defendant said, "that's the op," meaning "the enemy, the opposition," and "that's Droppa that got Twin killed in Trinidad." *Id*. Later, at approximately 2:54 A.M., Philip and an associate walked past the area where the Defendant was, at which point Defendant stepped in their pathway and faced them. *Id*. Defendant subsequently allowed Philip and his associate to pass by, but then turned to follow them and began firing his gun several times. *Id*. Philip started to run towards the exit of the building but then fell to his side onto his stomach, at which point Defendant stood over him and fired his gun at close range at Philip's head; Philip died shortly thereafter. *Id*. While club patrons were fleeing the area during the shooting, a female bystander was shot in the stomach and arm, but survived. *Id*. After the shooting, one of Defendant's associates grabbed the gun used by Defendant in the shooting and fled the area. *Id*. Defendant then exited the lounge and walked along Flatbush Avenue. *Id*. Surveillance footage captured Defendant taking off his hat and throwing it between two vehicles, and also taking off his shirt, which he threw into a pile of garbage, while walking. *Id*.

On September 16, 2015, Defendant was remanded to custody pursuant to a Violation of Supervised Release hearing in relation to his involvement in the instant murder. *Id.* ¶ 8. At an evidentiary hearing on January 7, 2016, the Court found Defendant guilty by a preponderance of the evidence of murdering Philip in violation of his supervised release term, and sentenced the

defendant to 24 months of custody on May 11, 2016. *Id.* Upon satisfaction of his sentence for the supervised release violation, Defendant was federally charged in connection with the instant offense while incarcerated at Federal Correctional Institute in Allenwood, Pennsylvania, on June 12, 2017; he made no post-arrest statement. *Id.*

Defendant was arraigned at the Brooklyn courthouse in the Eastern District of New York on June 23, 2017, pursuant to an indictment filed in this district charging him with Murder-in-Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1), and he remains in federal custody at the Metropolitan Correctional Center in Manhattan, New York. *Id.*

### B. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The instant sentence adequately punishes the Defendant for his crime and provides both general and specific deterrence. Defendant, at point-blank range, shot and killed Chrispine Philip. PSR ¶ 7. At the same time, Defendant shot and injured an innocent bystander. *Id.* This sentence will deter others from engaging in similar conduct, and justly punishes Defendant for the severity of his actions.

### C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

The statutory provision regarding terms of custody for Defendant's offense requires mandatory life imprisonment. 18 U.S.C. § 1959(a)(1). The Court may impose a term pf supervised release of not more than five (5) years. 18 U.S.C. 3583(b)(1). Defendant is ineligible for probation because the offense is a Class A felony. 18 U.S.C. § 3561(a)(1).

Additionally, Defendant faces a maximum fine of $250,000.00 per count pursuant to 18 USC. §3571(b) and a mandatory assessment of $100.00 per count pursuant to 18 U.S.C. § 3013. Pursuant to 18 U.S.C. § 3663A, restitution in an amount to be determined shall be ordered in this case. As noted above, to date, the total; losses of the victim's family are unknown. Per guidance from *United States v. Catoggio*, 326 F.3d 323 (2d Cir. 2003), restitution should not be ordered when losses incurred by the victim are not identified. However, the Court may hold an evidentiary hearing within 90 days after sentencing, per 19 U.S.C. § 3664(d)(5), to determine issues of restitution.

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A

The parties agree the most appropriate guideline for this 18 U.S.C. § 1959 offense is U.S.S.G. § 2E1.3(a)(2), which refers to the guideline for the underlying crime or racketeering activity. As the underlying crime constitutes first-degree murder, in violation of 18 U.S.C. § 1111, the applicable guideline is 2A.1.1(a), which provides a base offense level of 43. No specific offense characteristics apply to this guideline. Based on a total offense level of 43 and a criminal history category of IV, the guideline imprisonment term is life. Since the offense is a

Class A Felony, the guideline range for a term of supervised release is 2 to 5 years. U.S.S.G. § 5D1.2(a)(1). Defendant is ineligible for Probation because the offense is a Class A felony. U.S.S.G. § 5B1.1(b)(1). The fine range for this offense is from $25,000.00 to $250,000.00. U.S.S.G. §§ 5E1.2(c)(3) and (h)(1).

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor, requiring the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission," 18 U.S.C. § 3553(a)(5). The Probation Department provided the following statement in consideration of a departure from the sentencing guidelines:

> As detailed in the *Offense Conduct* Section above, the defendant's conduct appears to have gone beyond that of the charged gang rival murder offense, as an innocent bystander was shot by the defendant during the incident resulting in the murder of Chrispine Philip. This constitutes additional criminal activity for which the defendant is not held accountable in the advisory guideline calculations, and may warrant an upward departure, pursuant to USSG §5K2.21.

PSR ¶ 83.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Lastly, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). As noted above, to date, the total losses of the victim's family are unknown. However, the Court may hold an evidentiary

hearing within 90 days after sentencing, per 18 U.S.C. § 3664(d)(5), to determine issues of restitution. Pursuant to the Guideline Provisions, restitution shall be ordered. U.S.S.G. §5E1.1.

## CONCLUSION

And finally, the Court has this to say to Mr. Pagett. On October 16, 2018 during the trial in this case, a witness named Neil Jordan testified that two days after he saw Mr. Pagett shoot Mr. Philip to death in the club, he saw Mr. Pagett in Foster Park. When asked about that conversation, Jordan testified:

> [Pagett] walked up and was just like, I had to shoot him up. . . . I told him, that shit was crazy. And that's when Theo walked in and he told Theo, like, yo, I did that shit. And Theo was like, yeah, you did some John Wayne shit. He told him it was stupid and [Pagett] was like, yeah, I did. I did some John Wayne shit.

Trial Transcript at 151, ECF No. 99.

When Mr. Pagett summoned the ghost of John Wayne, he was perhaps more on target than he imagined. In 1972, John Wayne, then an aging conservative actor, made one of his final movies: The Cowboys. In that movie, a young, progressive, and relatively unknown actor named Bruce Dern was cast as the character named "Long Hair." In recruiting Dern for that role his agent told him: "I have a role you must do. No one can know this. They're doing a movie where John Wayne's going to be killed, and you're going to be the guy who does it!"

Sure enough, when Dern arrived on set to shoot that scene, the moment was classic. As Dern recalls:

> It was 8:30 A.M. in the morning when we did the scene, Wayne was already incredibly shitfaced on Wild Turkey, a bottle and a half. I could smell it on him, and he leans into me and says, "Ohhh, how they're gonna hate you for this." Dern laughed and replied, "Maybe, but in Berkeley, I'm a hero."

The two actors both laughed and, after shooting the scene—despite their political differences—bonded nicely: going drinking together in clubs and, since they both loved sports, going to Lakers games.

You see, the killing of John Wayne in The Cowboys was a movie killing. The actors were real life flesh and blood human beings who after shooting the scene, went drinking in the club, went to see the Lakers, and then went home alive.

However, when Mr. Pagett shot Chrispine Philip in the back, in the club, he shot a real man, in real life. He removed him from the real world. Mr. Pagett devastated Mr. Philip's family in the real world. So no, what Mr. Pagett did was not "some real John Wayne shit." John Wayne and Bruce Dern made a make believe western. Mr. Pagett made a real-life murder. And in America, even in Hollywood, the law has never condoned real life murder. And the law never will.

Therefore, the Court hereby sentences Mr. Pagett to a sentence of life imprisonment followed by five (5) years of supervised release. This sentence is appropriate and comports with the dictates of § 3553. This sentence is consistent with and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2). The Court expressly adopts the factual findings of the Presentence Investigation Report and the Addendum to the Presentence Investigation Report, barring any errors contained therein.

**SO ORDERED.**

_____s/ WFK_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: June 28, 2021

Brooklyn, New York